```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 1:21-cr-00400-NLH |
| v. | **OPINION** |
| ANTHONY D. PARKER | |

**HILLMAN**, District Judge

As this Court reserved the right to do, this Opinion supplements and further explains the Court's oral decision on March 10, 2022 to grant the Government's application to dismiss a deliberating juror, Juror #12, for cause.

### BACKGROUND

The Government's application arose out of concerns regarding the deliberative process of an empaneled petit jury during phase I of a bifurcated criminal trial. The defendant, Anthony Parker, was indicted on two counts, Count I, for being a felon in possession of a firearm, and Count II, for witness tampering. The parties agreed to a bifurcated trial in which Defendant would be tried on Count II in phase I and Count I in phase II. As part of phase I, there were two special interrogatory questions for the jury to answer in addition to Count II. Special Interrogatory I read, "Did the defendant,

Anthony D. Parker, on or about April 14, 2021, knowingly possess a firearm, namely one Glock 9mm semi-automatic pistol, Model 19 Gen 5, bearing seral number BGMX058?"  Special Interrogatory II read, "Did the defendant, Anthony D. Parker, possess that firearm in or affecting interstate or foreign commerce?"

   The Court first learned of troubling conduct by Juror #12 after the jury had been deliberating for several days.  As relayed by the Court's courtroom deputy, the court security officer, sworn to keep the jury in a safe place for their deliberations, reported that Juror #12 had left the jury room in a hurried state leaving the other jurors behind.  The Courtroom Deputy reminded the jurors that they could not deliberate without all 12 members present and they departed.  It was later revealed during the Court's voir dire that Juror #12 had left before the time the jury had all agreed to stay for the day.

   After deliberations continued, the jury reported that they had reached a verdict on Court II, the witness tampering charge, but could not reach a unanimous verdict on the Special Interrogatories.  The Court gave the jury the Third Circuit Model Jury Instruction 9.05, the so-called modified Allen charge, and instructed them to continue deliberating.  On Friday, February 25, 2022 while the jury was still deliberating, the Court received a note from the foreperson indicating that

there was concern in the jury that Juror #12 was not participating in the deliberative process.

In order to assess the assertions in the foreperson's note, the Court conducted a voir dire of each juror individually to ask them if they had any reason to believe that any of the jurors – without the Court specifying one - could not, or would not, deliberate.  Eight of the twelve jurors answered in the affirmative and identified Juror #12.  The foreperson, Juror #7, indicated that Juror #12 said "she don't want to be here anymore" and that she was being combative and almost vomited in the trash can.  The foreperson also indicated that Juror #12 revealed to the other jurors during deliberations that she had a nephew in jail, though she did not so indicate during voir dire prior to the trial.

Juror #3 indicated that before jury selection in the jury assembly room, Juror #12 said that "she won't judge anybody." Juror #3 also indicated that Juror #12 injected race into the deliberations.[1]  Specifically, Juror #3 heard Juror #12 mumble under her breath that deliberations were futile because "the white faces have decided."  She also stated that Juror #12 indicated that she "doesn't want to hear from us anymore."

---

[1] Juror #12 was one of only two African-Americans on the 12-member jury.  Juror #1, also African-American, fully participated in deliberations through the non-guilty verdict on Count 11 and in answering the two Special Interrogatories.

3

Juror #4 indicated that she had heard that Juror #12 had said that she did not want to judge anyone and also that Juror #12 raised the possibility that the police planted the gun in the defendant's car.[2] Juror #5 also stated that he heard Juror #12 say that she had a nephew in jail and that generally he noticed that she was "recalcitrant" to engage with the other jurors in discussions, that she put her "head down on the desk," and that she refused to listen to any alternative perspectives.

Juror #6 reported that he noticed Juror #12 becoming combative with another member of the jury and that Juror #12 stated during deliberations that "she didn't want to send anybody to prison." Juror #8 had a similar experience with Juror #12, stating that "[i]n my presence, she has said on multiple occasions that she does not want to be here, hands are up, wishes she never got picked. She said yesterday she wishes you guys [i.e., the attorneys and the Court] kicked her off."

---

[2] There was no evidence introduced at trial to the suggest the gun was planted by the police nor were there any arguments or suggestion of such a plot to that effect from the defense. In fact, the defense that was actually presented, and rejected by the jury, was that a friend of the Defendant had borrowed the Defendant's car where the gun was found and that the friend's compatriot – a third individual - had hidden his gun in the dashboard so as not to frighten two prostitutes they had picked up to have sex with in the car the night before the car was seized and searched. In short, the defense did not contend the gun must have been planted but rather contended it was placed in the car with the Defendant's knowledge by someone other than the police.

Juror #8 also stated that Juror #12 refused to look at the evidence[3] and Juror #12 was not listening to what other jurors were saying during deliberations and displayed dismissive body language.  Juror #10 indicated similarly that Juror #12 refused to look at the evidence.  Juror #10 also indicated that he saw Juror #12 inject race into deliberations by suggesting that the Defendant was being prosecuted because he was a black man.[4]  Finally, Juror #11 stated that Juror #12 would turn away from the other jurors when they were discussing the evidence.

After conducting a voir dire of the other jurors, the Court made inquiry of Juror #12 on Friday, February 25, 2022 and again Monday, February 28, 2022.  Juror #12 confirmed that her nephew had been on parole in New York State for drug charges at the time of jury deliberation, a fact that should have been disclosed during jury selection but was not, but had only been reincarcerated after trial had begun when a gun was found in a

---

[3] Besides the testimony of the witnesses, much of the evidence in the case involved still photographs, charts, maps, police body-worn camera video footage, and surveillance videos.  Each of the jurors was given a tablet device with the evidence loaded on it so that they could view the visual evidence collectively and independently for purposes of deliberations.

[4] The cold record will not reflect but the Court notes that the Detective Henry, the only government witness to testify that he saw the Defendant with a gun, and the lead case from the Bureau of Alcohol, Tobacco, Firearms, and Explosives, who sat at the prosecution table throughout the trial, were both African-American.

5

car in which he was a passenger.  Juror #12 denied that she ever said that she was not going to participate in juror deliberations.  However, she did admit that she stated, "I don't judge anyone" but explained that she meant it in the way that "if you were walking down the street and you had funny looking shoes on, I wouldn't judge you."  She further indicated that she would not have trouble judging anyone if she had "all the facts."  The Court considers the totality of what it heard from all of the jurors in determining whether dismissal is appropriate.

## DISCUSSION

### A. Legal Standard of a Motion for Motion to Dismiss and Judgment on the Pleadings

The standard to dismiss a juror during deliberations in this Circuit is set forth in United States v. Fattah, 914 F.3d 112 (3d Cir. 2019).  Fattah emphasized that "District courts may discharge a juror for bias, failure to deliberate, failure to follow the district court's instructions, or jury nullification when there *is no reasonable possibility that the allegations of misconduct stem from the juror's view of the evidence*."  Id. at 150 (internal alterations omitted) (emphasis in the original).  This standard is similar to the "beyond a reasonable doubt standard" required to convict a defendant at a criminal trial.  Id.

In rendering its holding in Fattah, the Third Circuit made clear that the district court is entitled to significant deference in deciding whether to dismiss a juror because the district court is closer to the facts and actually has the opportunity to observe the juror's demeanor. Id. ("[A] district judge is best situated to assess the demeanor of a juror."); United States v. James, 955 F.3d 336, 346 (3d Cir.), cert. denied, 2020 WL 5882983, 208 L. Ed. 2d 70, 141 S. Ct. 329 (2020) ("District courts have wide latitude in making the kind of credibility determinations underlying the removal of a juror, because their unique perspective at the scene places them in a far superior position to determine the proper course of action when issues of juror disqualification arise[.]") (internal alterations and citations omitted). Following its decision in Fattah, the Third Circuit has applied Fattah's logic to uphold the dismissal of a juror and the seating of an alternate where part of the basis for the dismissal included concerns by other jurors and the district court's finding that the juror was not being candid with the court. James, 955 F.3d at 347.

Here, on the totality of the evidence before it, the Court holds that dismissal of Juror #12 and her replacement with an alternate juror is not only appropriate but necessary.[5] Eight of

---

[5] The Court dismissed Juror #12 on the morning of March 10, 2022 and instructed the newly constituted jury to begin deliberations

7

the eleven jurors besides Juror #12 separately noted instances in which they heard Juror #12 indicate that she was not willing to deliberate.  Various jurors affirmatively indicated that Juror #12 refused to view the evidence and brought up that her nephew was in jail.  Two of the jurors indicated that they saw Juror #12 inject race into the deliberations, one who heard Juror #12 call the other jurors "white faces" and another who stated that it appeared Juror #12's opinion on any verdict was based on race.  The Court weighs the testimony of the other jurors heavily as they each referred to different instances that some of them witnessed, heard or saw independently, bolstering the Court's confidence that their concerns are not the result of "group think" or an impermissible effort to remove a juror because she viewed the evidence in a different light.

In addition, the Court did not find Juror #12's denials of having made the statements they said she made or having acted in the way they observed to be credible.  While her demeanor was calm and her answers direct, they were oddly cold and devoid of any hint of emotion or concern despite the seriousness of the claims against her.  Second, the Court is not surprised that Juror #12 would deny the veracity of the concerns raised by the

---

anew.  The jury reaffirmed a unanimous verdict of not guilty on Count II and answered the two interrogatories relevant to the felon in possession charge in the affirmative with unanimity.

other jurors when faced with having to admit them directly to a federal judge.  To have done so, would have been tantamount to an admission that she was not following the Court's instructions.  To be clear, the Court was open to the possibility that her dispute with the other jurors was evidence-based but the specificity of the claims against her when juxtaposed with her bland and monotone denials left the Court with the firm conviction of a dissembling lack of candor.

Equally disturbing and separately disqualifying is the fact that Juror #12 never indicated that she had a nephew on probation during the initial voir dire process despite the Court having asked several questions that would have captured that fact.  Her failure to disclose this information is consistent with her later lack of candid and an impermissible bias against prosecution irrespective of the weight and quality of the evidence.  Finally, while Juror #12 did admit to having said that she would not judge anyone her post-hoc justification that she only meant that she would not make assumptions about others falls flat given the context in which she repeatedly made that statement.

It is not an easy and cheerful task to dismiss a deliberating juror; one who had survived the fairly rigorous test of the Court's attorney-assisted pre-selection voir dire and who had pledged under oath to serve without

9

predetermination, bias, or prejudice and to decide the matter solely on the evidence presented in court.  Such a calculus and need to apply the legal standards accurately is even more pronounced when the dismissal would have the effect of removing one of the only two African-American jurors on the twelve member panel sitting in judgment of an African-American defendant.

And the Court must always remain cognizant of the difference between a juror who disagrees in good faith with fellow jurors on the meaning and import of evidence, on the one hand, and a juror, on the other hand, who refuses to deliberate in good faith based upon impermissible reasons and prejudicial reasons unrelated to their views of the evidence.  The Court is convinced Juror #12 is squarely in the latter category and that her denials were not credible given the broad consensus to the contrary reached by the other jurors.

Ultimately on the facts presented here, the issue of race and a jury reflective of the community at large must fall away in favor of a first principle of equal importance - that the jury panel, to a person, uphold the oath they had taken as jurors to weight the evidence fairly and impartially, without bias or prejudice, and to listen to each other's views on that very same evidence.  This was something that Juror #12 could not, or would not, do.

More specifically, the Court finds beyond a reasonable doubt that Juror #12's intent, perhaps from the beginning and certainly by the time deliberations had begun, was not to abide by her oath but to undermine that solemn pledge through impermissible juror nullification.  Having observed her demeanor and weighed her answers against the other jurors, the Court is convinced that there is "no reasonable possibility that the allegations of misconduct stem from the juror's view of the evidence.  Fattah, 914 F.3d at 150.  Therefore, in accord with the standard set forth in Fattah, Juror #12 must be dismissed.

## CONCLUSION

For the foregoing reasons, the Government's application to dismiss Juror #12 will be granted.

|  |  |
|---|---|
| At Camden, New Jersey | /s      Noel L. Hillman<br>NOEL L. HILLMAN, U.S.D.J. |